In the Matter of M.A.H., An
Alleged Deprived Child.

Franklin D. FLOYD, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. 80941.

Supreme Court of Oklahoma.

July 6, 1993.

Mack Martin, Laurel S. Smith, Oklahoma City, for appellant.

Susan C. Stallings, Asst. Dist. Atty., Oklahoma City, for appellee.

Pete Gelvin, Asst. Public Defender, Oklahoma City, for the Child.

ALMA WILSON, Justice:

■ The dispositive issue in this case is whether an alleged father is entitled to contest the validity of court-ordered blood test results by cross-examination of the examiners and by independent blood test results. We hold that 10 O.S.1991, § 502 requires that an alleged father be allowed an opportunity to cross-examine the examiners who performed the blood tests and to offer the results of blood tests performed independent of the court-ordered testing.

Sometime in early May, 1990, an infant was brought to the Department of Human Services (DHS) by an adult male, who identified himself as Clarence Marcus Hughes.[1] Hughes provided the following information to DHS: 1) the infant is M.A.H. born March 21, 1988; 2) he, Clarence Marcus Hughes, is the father; and, 3) the mother is Tonya Dawn Hughes, deceased.[2] On May 17, 1990, a petition was filed alleging that the child, M.A.H., was deprived and requesting that the child be made a ward of the court. Summons issued to Clarence Marcus Hughes was returned not found. Based upon information from law enforcement, summons was issued and served on Franklin D. Floyd a/k/a Clarence Marcus Hughes.[3]

In July, 1990, appellant, Franklin D. Floyd (Floyd), requested that the district court appoint counsel to represent him in the deprived child proceeding. The request was denied. On August 23, 1990, the district court found that M.A.H. is deprived, declared the child a ward of the court and placed custody in DHS. At the review hearing in February, 1991, the district court ordered blood testing to determine paternity be performed.[4] Floyd appeared

1. In this appellate record, there is no clear evidence establishing the identity of the adult male who voluntarily left the child in the care of DHS.

2. There is no evidence conclusively establishing the real name, date and place of birth of the child, nor the parentage of the child. The pleadings identify the mother as Tonya Dawn Hughes, who, appellant's brief in chief alleges, was killed in a hit-and-run automobile accident on April 30, 1990; appellee's answer brief alleges that the mother is Sharon L. Marshall, deceased; and appellant's reply brief alleges that the mother is Linda Williams, deceased. The pleadings identify appellant as the father, but on appeal, the State and the child contend that the father is unknown because the blood tests exclude appellant as the natural father.

3. Process in this deprived child matter was served upon Floyd, as the father of M.A.H., at the United States Penitentiary, P.B.M., Atlanta, Georgia. Information from a law enforcement agency indicates that Floyd, as a fugitive for parole violations, was also known as Clarence Marcus Hughes. The record shows that, from 1973 through 1990, Floyd assumed various aliases including Whistle Britches Floyd, King Fish Floyd, Preston C. Morgan, III and Clarence Marcus Hughes.

4. The DHS service plan and placement of the child in a private foster home was approved by

through his counsel and made no objection to the order. At the next review hearing in July, 1991, Floyd's counsel offered a marriage certificate as proof of paternity of the child.[5] The district court again ordered paternity blood testing and Floyd's counsel objected.

The blood tests were performed in November, 1992.[6] The blood test report from Roche Biomedical Labs found that Floyd is excluded from paternity in six different systems and concluded that Floyd cannot be the biological father of the child. On December 7, 1992, the district court ordered that all contact between Floyd and the child be immediately halted.[7] On December 16, 1992, Floyd's counsel filed an objection to the blood test results and requested an evidentiary hearing to challenge the blood tests and results and to show a common law marriage and the existence of a presumption of legitimacy of the child. The next day, December 17, 1992, the district court denied the hearing request, stating: "Motion overruled—Blood tests exclude Franklin Floyd as father; no marriage certificate that references Franklin Floyd." Floyd appeals that order.

Floyd contends that the order for blood tests to determine paternity is contrary to 10 O.S.1991, § 3 and the order denying a hearing to challenge the blood test and to present evidence of common law marriage and independent blood test results is contrary to the Fifth and Fourteenth Amendments of the United States Constitution and Article 2, §§ 21 and 7 of the Oklahoma Constitution. On appeal, appellees, the State and the child, confess Floyd's due process challenge and ask this Court to remand the cause for an evidentiary hearing on the blood test results. Appellees assert that the Uniform Act on Blood Tests to Determine Paternity allows an alleged father the right to cross-examine the experts and to present independent blood tests. We agree. Accordingly, we do not consider the constitutional arguments.[8]

An alleged father's right to cross-examination and to present independent blood testing are critical safeguards in our evidentiary scheme where, as in the instant cause, the blood tests excluding the alleged father as a parent may have conclusive weight. 10 O.S.1991, §§ 501, et seq.[9] Section 501 of the uniform act authorizes the district court to order the mother, child and

---

the district court. The foster care of the child has been periodically reviewed by the district court and the Foster Care Review Board. 10 O.S.1991, §§ 1101, et seq.

5. The Certificate of Marriage offered by Floyd's counsel identifies the groom as Clarence Marcus Hughes, date of birth 10–13–48; the bride as Tonya Dawn Tadlock, date of birth 9–19–67; and the date of marriage as June 15, 1989. Information from law enforcement shows that Floyd was born on June 17, 1943, not October 13, 1948, and that Floyd has a string of criminal convictions for kidnapping, rape, child molestation and bank robbery dating back to 1962. Simple arithmetic reveals that if Floyd were born in 1948, he was fourteen years old in 1962 when he was convicted of a serious federal crime.

6. Blood testing was delayed by Floyd's reluctance and/or refusal to submit to blood testing while he was imprisoned and DHS' objection to release of confidential medical information relating to the deceased mother.

7. Throughout the deprived child proceedings, Floyd was imprisoned in a federal penitentiary and the child was cared for by foster parents. However, there were several visits between

Floyd and the child. In 1991, Floyd was transferred to the federal penitentiary in El Reno, Oklahoma. The district court, without objection, ordered Floyd to pay child support. The district court also approved monthly visitation between Floyd and the child at the El Reno penitentiary to reunite the family. DHS workers transported the child and supervised the visits. In October, 1992, two months prior to the order to halt visitation, Floyd was transferred to Memphis, Tennessee.

8. Constitutional questions will be determined only if necessary to adjudicate the rights of the parties. *Ranola Oil Company v. Corporation Commission of Oklahoma,* 752 P.2d 1116, 1118 (Okla.1988); and *Schwartz v. Diehl,* 568 P.2d 280, 283 (Okla.1977).

9. The Uniform Act on Blood Tests to Determine Paternity was originally enacted in 1967. 1967 Okla.Sess.Laws, ch. 157. Although the act has been amended several times, the act has not substantively changed. Blood tests were first ordered in this cause in February, 1991, and again in July, 1991 and January, 1992. The tests were performed in November, 1992 and submitted to the court in December, 1992. The 1991 statutes are applicable herein.

putative father to submit to blood tests in any civil action in which paternity is a relevant fact.[10] The order may be entered upon suggestion by the child, mother or putative father or motion of a party or by the court sua sponte. Section 502, in mandatory language, requires that the blood examiners be called as witnesses and give testimony as to their findings, and, in permissive language, authorizes any party to request blood tests independent of the court-ordered testing and to offer the results of the independent testing as evidence. Section 504 provides that evidence showing statistical probability of paternity, including blood testing results and medical, scientific and genetic findings and conclusions based on blood tests, is admissible. Section 504 further provides, in mandatory language, that the blood test evidence shall be conclusive proof of nonpaternity, if the district court finds that the blood tests show the alleged father is not the parent of the child. Section 505 destroys the presumption of legitimacy of a child born during wedlock, if the district court finds that all the involved blood examiners have reached the conclusion that the husband is not the father.

Section 502 is controlling herein. It provides:

> The tests shall be made by experts qualified as examiners of genetic markers present on blood cells and blood components. The experts shall be called by the court or by a party as witnesses to testify as to their findings and shall be subject to cross-examination by the parties. Any party may request that other experts qualified as examiners of genetic markers present on blood cells and blood components perform independent tests subject to order of the court, the results of which may be offered in evidence. The number and qualifications of said experts shall be determined by the court.

■ Section 502 unambiguously requires the district court to take testimony from the examiners of genetic markers present on blood cells and blood components and to allow cross-examination of the blood examiners before admitting the test data and results into evidence. Thus, we hold that § 502 imposes the taking of testimony from the blood examiner experts as to their findings as a foundational requisite to the admission of blood test data and results as evidence of paternity or nonpaternity.[11] The blood test data and results in this cause are not properly before the district court. On remand, if the blood examiners are not subpoenaed as a witness, the district court shall direct the State to subpoena those experts and receive testimony as to their findings prior to admitting the blood test data and results into the record as evidence.

■ Further, § 502 plainly requires the district court to order the performance of additional blood tests when requested by

---

**10.** Section 501 was amended in 1991. 1991 Okla.Sess.Laws, ch. 71, § 5. The 1991 changes placed paternity determinations in the exclusive jurisdiction of the district court. Paternity had been determined in administrative proceedings of the Department of Human Services as well as the district courts.

**11.** In *Callison v. Callison*, 687 P.2d 106, 112 (Okla.1984), the district court took judicial notice of the examiners' conclusion that Callison could not be excluded as the father of the child based on the HLA blood tests showing a 94.37% probability that he fathered the child. Finding that the parties had every opportunity to challenge the taking of judicial notice, this Court upheld the admitting of the results of paternity blood tests into evidence.

We are cognizant that today's holding was expressed in the opinion by Opala, J., concurring in part and dissenting in part, *Callison v. Callison*, 687 P.2d at 112, 115. Today's opinion does not overrule *Callison*. The Callisons were married, divorced and then lived together. A child was born after the divorce. Mr. Callison denied paternity; asserted a statute of limitations defense; and, challenged the admissibility of the blood test results for lack of proper foundation. Mr. Callison completed extensive discovery into the testing process; failed to challenge the mother's request that the blood test results be admitted into evidence by judicial notice; failed to object to judicial notice upon the court's specific inquiry; but, objected when the final results showed a 94.37% probability of paternity. *Callison* is distinguishable on the issues presented and the procedure as well as the facts.

# 1070

a party.[12] On remand, the district must permit Floyd to obtain independent blood testing, if requested, and it must determine the number and qualifications of the blood examiners to perform the tests, who shall be independent of the court-ordered blood testing examiners.

 Floyd also challenges the authority of the district court to order paternity blood testing. Floyd asserts that his paternity of M.A.H. is conclusive by operation of 10 O.S.1991, § 3. Section 3 provides that the presumption of legitimacy cannot be disputed where a child is born during a marriage and cared for by the husband and wife as a member of their family without any dispute as to legitimacy for a period of two years. The presumption of legitimacy is set forth in 10 O.S.1991, § 1, which provides: "All children born during wedlock are presumed to be legitimate."

 A presumption of legitimacy does not arise out of allegations. A presumption of legitimacy requires proof of marriage of the parents at the time of birth of the child and the limitation in § 3 requires proof that the child was born during marriage and that the husband and wife cared for the child as a member of their family for at least two years without any question of parentage. There is no evidence in the appellate record that would give rise to a presumption of legitimacy, nor is there any evidence supporting Floyd's asserted time-bar.[13]

The district court originally ordered paternity blood testing in this case in February, 1991 and the testing occurred in late 1992. Although imprisoned, Floyd was represented by counsel throughout this time. There is nothing in the appellate record that indicates Floyd's counsel proffered any evidence to support his claimed

presumption of legitimacy other than the marriage certificate from Louisiana. That marriage certificate contains neither Floyd's true name nor his actual birth date.[14] We will not disturb the reliability or lack thereof assigned by the district court to that marriage certificate evidence. The paternity of M.A.H. is a relevant fact in this deprived child action. Paternity of M.A.H. was subject to dispute when the district court ordered blood testing to determine paternity. Accordingly, the district court had authority to order blood testing to determine paternity pursuant to 10 O.S.1991, § 501 and those orders are proper and valid.

DISTRICT COURT ORDER REVERSED; CAUSE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

LAVENDER, V.C.J., and HARGRAVE, KAUGER, SUMMERS and WATT, JJ., concur.

SIMMS, J., concurs in result.

---

**12.** The term "party" is used in 10 O.S.1991, § 501 to include those persons served with process and any person whose blood may be involved.

**13.** We note that under 10 O.S.1991, § 505 the presumption of legitimacy may be overcome by blood test evidence. Section 505 reads:

The presumption of legitimacy of a child born during wedlock is overcome if the court

finds that the conclusions of all the experts, as disclosed by the evidence based upon the tests, show that the husband is not the father of the child.

There is no contention in this appeal that § 505 is an exception to or conflicts with § 3 and we do not address any such hypothetical question.

